IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ANTONIO GONZALEZ, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HCA HEALTH SERVICES OF TENNESSEE, )<br>INC. d/b/a SUMMIT MEDICAL CENTER, )<br>)<br>Defendant. ) | Case No. 3:06-cv-0767<br><br>Judge Thomas A. Wiseman, Jr. |

**MEMORANDUM OPINION**

Plaintiff Antonio Gonzalez filed this action against HCA Health Services of Tennessee, Inc. d/b/a Summit Medical Center ("Summit") alleging unlawful discrimination on the basis of national origin and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401 *et seq.* ("THRA"). Summit has filed its Motion for Summary Judgment (Doc. No. 23) along with a supporting Memorandum of Law (Doc. No. 24), Statement of Undisputed Facts (Doc No. 25), and various exhibits and declarations. Gonzalez has filed his Response to Defendant's Statement of Undisputed Facts (Doc. No. 33) and Response in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 32), in which Gonzalez concedes that Summit is entitled to judgment in its favor on his claims of discrimination. Gonzalez contends, however, that material issues of disputed fact preclude summary judgment of his retaliation claim under Title VII and the THRA.

Based upon Gonzalez' concessions, the Court will grant summary judgment in favor of Summit and dismiss Gonzalez' discrimination claims. With respect to the retaliation claim, as set forth below, the Court finds that Gonzalez has established a *prima facie* case of retaliation, but Summit has set forth legitimate, non-discriminatory reasons for Gonzalez' termination which Gonzalez has not demonstrated to be pretextual. Summit is therefore entitled to summary judgment on the claim of retaliation too.

**I.      STANDARD OF REVIEW**

Summary judgment is appropriate "[if] the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material

fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence "could not lead a rational trier of fact to the find for the non-moving party").

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587; *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001). Justifiable inferences based on facts are also to be drawn in favor of the non-movant. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999). "The Court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue of trial.' " *Little Caesar Enters. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Liberty Lobby*, 477 U.S. at 249). If, however, the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Background

Defendant Summit is a full-service medical and surgical facility located in Hermitage, Tennessee. Plaintiff Gonzalez is of Hispanic descent. He was born and raised in California and subsequently moved to Tennessee. Gonzalez worked at Summit from approximately November 9, 2002 through April 24, 2006, primarily in the position of lead respiratory therapist. As a lead respiratory therapist, Mr. Gonzalez had the authority to assign work to other respiratory therapists.

### B.     Plaintiff's Employment at Summit

Until his termination Gonzalez was never demoted, never had his hours of work reduced nor had his benefits reduced. (*See* April 27, 2007 Deposition of Antonio Gonzalez (Doc. No. 29-5) ("Second Gonzalez Dep.") at 42:12–43:4.). Gonzalez' responsibilities did not change throughout his tenure at

2

Summit. (*Id.*) Summit contends, however, that Gonzalez had difficulty interacting with his co-workers throughout his tenure, and that Gonzalez' tone of communication with others was at times unprofessional and improper in a work setting. As a result, Gonzalez was counseled on multiple occasions that he needed to improve his communication skills. For instance, Gonzalez received a Performance Evaluation for the year 2004 which stated that "his occasional failure to think thoroughly before speaking . . . causes him to offend others." (Doc. No. 29-6.) Gonzalez admits that he was counseled about his communication style, but denies that the tone of his communications was ever improper. Further, Gonzalez asserts that "on occasion he would speak Spanish and this apparently offended some employees." (Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. No. 33) (hereafter "Resp. to SUF"), ¶ 6.)

In Gonzalez' 2005 Performance Evaluation, dated December 25, 2005, Holly Hill, the Director of the Cardio-Pulmonary Unit and the person who oversaw the respiratory therapy department, again indicated to Gonzalez that he "need[ed] to work on interpersonal communication with nursing and other personnel and to be more diplomatic and tactful in his communication patterns." (Doc. No. 29-7.) He was also encouraged "to develop conflict management skills in addressing other leads when he believes they are not completing all assigned duties on their shifts." (*Id.*) Gonzalez again does not dispute being told he needed to work on interpersonal communication but denies that such criticism was warranted. (Resp. to SUF ¶ 7.)

On January 5, 2006, within a week after receiving his 2005 Performance Evaluation, Gonzalez left a voicemail for Donna Lovitt, the Clinical Coordinator for Respiratory Therapy and his supervisor. Lovitt described the voicemail as "very scathing, angry and demanding. . . . Mr. Gonzalez accused his co-workers of being lazy." (*See* Declaration of Donna Lovitt (Doc. No. 27) ¶ 5.) Gonzalez contends that Lovitt's subjective perception of his tone of voice on the message is not "a proper subject for summary adjudication," that he was extremely busy with a patient and needed her help, and that his accusations against his co-workers were in furtherance of trying to get his own job completed. (Resp. to SUF ¶¶ 8–9.) Gonzalez admitted in his deposition that, while he did not intend to be rude, Lovitt honestly believed he had yelled at her in his voice message. Now, however, Gonzalez contends that his subjective perception of Lovitt's response to his message is speculative and that a factual dispute remains as to whether Lovitt really believed he had yelled at her. (Resp. to SUF ¶ 11.)

3

Summit has produced evidence in the form of his supervisors' declarations as well as contemporaneous notes that they received multiple complaints from staff about Gonzalez' attitude and communications over the next few days following the voice-message incident. Gonzalez denies these allegations and contends they are nothing more than hearsay. (Resp. to SUF ¶ 12.) He does not dispute the fact that Summit received the referenced complaints.

On January 19, 2006, Lovitt and Holly Hill met with Gonzalez to discuss the various complaints they had received regarding his behavior and also gave him a written warning documenting the content of the conversation. (*See* Written Warning, Doc. No. 29-8.). Specifically, Lovitt informed Gonzalez that "his behavior of openly expressing anger in front of the staff, demeaning co-workers and accusing people of being lazy will not be tolerated," that "immediate and consistent change in his behavior was required or disciplinary action would be taken," and that he "must treat his co-workers, subordinate staff, nursing and all other hospital personnel with respect." (*Id.*) Gonzalez signed the written warning and does not dispute the content of the meeting with Lovitt and Hill. He denies, however, that the written or verbal warnings were justified. (*See id.;* Resp. to SUF ¶¶ 14–17.)

In March of 2006, Eric Peiffer, a respiratory therapist, resigned; he stated in his exit interview that dealing with the "day shift lead therapist" was one of the things he disliked most about his job. (Doc. No. 29-12, at 1). The interviewer's notes make it clear that Gonzalez was the lead therapist with whom Peiffer had difficulties, and that Gonzalez and Peiffer had had a "personality conflict" since Peiffer began working at Summit in March of 2005. (*Id.*)

**C.     Plaintiff's Termination**

All About Staffing is a hospital staffing agency that supplies temporary workers to Summit. Paula Beecher is the Regional Vice-President of Operations for All About Staffing. On April 16, 2006, Tom Ozburn, Summit's Chief Operating Officer, received an e-mail from Beecher expressing her concern about two telephone calls she received from Gonzalez on April 7, 2006. (*See* Declaration of Tom Ozburn (Doc. No. 28) ("Ozburn Decl.") ¶ 5.) The e-mail stated:

Tom,

Sorry for the delay in response on this matter. Per our conversation here is an incident that occurred:

4

> Friday April 7, 2006 we were experiencing bad weather and Tornado warnings. My staffing office staff were afraid and went to the stairwell for cover. Due to the nature of our business operations had to continue. I was working in the staffing office assisting with confirmation time for the facilities. I answered the phone and noticed on the caller ID that [*sic*] number was from Summit Medical Center. When I answered the telephone the caller responded "Ola, Paola" in a very inappropriate seductive way. I redirected the conversation by stating, "Excuse me, this is All About Staffing, may I help you". The caller continued. I questioned who the person was and they stated "Antonio from Summit". I asked him if I could be of assistance and he stated, I need to cancel your staff for tonight, I asked him to hold while I pulled the information up in the system. I then informed him that we did not have any staff on for him tonight and inquired if he would like me to find him additional help. He responded "No I don't need any additional help, I was just trying to prove a point to my staff". He was laughing and continued to speak to me in a very inappropriate manner. He then hung the phone up without saying goodbye just laughing.
>
> I called the Respiratory department back approximately 15 minutes later and the phone was answered by "Steve". I explained to him that I had received a call a few minutes ago regarding canceling staff and I was confused as there were not any staff booked for his facility, however I wanted to verify that he did not in fact need assistance. Steve asked me to hold and placed Antonio back on the phone. Antonio was once again very inappropriate with his communication style and began stating "Ola, Paola" again over and over in a very seductive way. This was a very uncomfortable feeling.
>
> Please let me know if you need anything further.

(Doc. No. 29-9.)

At the time Beecher contacted Ozburn regarding the telephone calls with Gonzalez, Ozburn was already aware of the prior complaints about Gonzalez although he did not directly supervise Gonzalez. Ozburn testified that he considered Beecher's report particularly troubling because it occurred during a disaster drill on a day that Middle Tennessee was experiencing multiple tornadoes. Ozburn also stated he was unaware of any reason why Beecher or any Summit employee would make up false criticisms of Gonzalez. Ozburn testified in his declaration that he believed Beecher's complaint and the other reports of Gonzalez' communications difficulties. On the basis of these complaints, Ozburn decided that Gonzalez had been given ample prior notice and opportunity to improve his behavior, that he had not in fact improved, and that his employment should be terminated. Ozburn drafted a memo to Gonzalez, with a carbon copy to Lovitt, dated April 24, 2006. The memo stated that April 24, 2006 would be Gonzalez' last day of employment at Summit and indicated that the reason for his termination was that he had not improved his behavior despite receiving numerous warnings that he needed to do so. The memo also listed the behavioral problems that had been reported during Gonzalez' employment, including: (1) on January 28, 2004, Gonzalez was instructed in his 2004 Performance Evaluation to improve his

5

communication skills with fellow employees as to not offend others; (2) on December 28, 2005, Gonzalez was instructed in his 2005 Performance Evaluation to improve his interpersonal communication and work on conflict management; (3) on February 10, 2005, Gonzalez was reported for poor communication with a nurse; (4) on March 15, 2005, Gonzalez "was written up and found to have made false and inaccurate statements" and "had made requests to the Human Resources department to alter data to circumvent federal tax laws"; (5) on January 2, 2006, Gonzalez was reported for not fulfilling his responsibilities; (6) on January 3, 2006, Gonzalez was reported by fellow staff members as being verbally abusive and overbearing; (7) On January 8, 2006, Gonzalez was lecturing others about his personal religious beliefs; (8) also on January 8, 2006, Gonzalez was reported for being hostile to an agency employee; (9) on January 9, 2006, Gonzalez received a written warning stating that an immediate change in his behavior was required to avoid further action; (10) on January 18, 2006, Gonzalez was referred to as being difficult to work with during an investigation springing from an anonymous call to HCA's Ethics hot line; (11) on March 31, 2006, Gonzalez was referenced in an exit interview as being a reason why an employee did not like to work at the hospital; and (12) on April 16, 2006, Gonzalez was a caller who allegedly made inappropriate, seductive comments to Paula Beecher from All About Staffing. (*See* 4/24/2006 Ozburn Memorandum to Gonzalez, Doc. No. 29-11.)

### D. Plaintiff's EEOC Reports

In approximately November 2005, Gonzalez complained that employees in the respiratory therapy department were being discriminated against on the basis of his national origin.[1] (*See* Ozburn Decl. ¶ 12.) On January 12, 2006, Gonzalez made a similar assertion in a formal complaint made on Summit's ethics hotline and in a charge with the Equal Employment Opportunity Commission ("EEOC"). (*See* Doc. No. 29-13.) According to Ozburn, Summit took the allegations seriously and investigated them, but found no evidence of unlawful discrimination. (Ozburn Decl. ¶ 12.)

On April 28, 2006, immediately after he was fired, Gonzalez filed a second EEOC charge of discrimination based on his national origin, retaliation and "other." (Doc. No. 29-14, at 1.) On July 31, 2006, the EEOC issued a "no cause" determination as to both the January 12, 2006 and April 28, 2006

---

[1]The record does not indicate to whom this complaint was made.

6

complaints brought by Gonzalez. (Doc. No. 29-15, at 1–2.) Gonzalez brought this action on August 8, 2006, alleging discrimination and retaliation in violation of Title VII and the THRA.

## III. DISCUSSION AND ANALYSIS

### A. Discrimination Claims

Gonzalez does not oppose summary judgment for Summit on his claims of discrimination on the basis of race or national origin. (Doc. No. 32, at 3). The Court will therefore grant summary judgment for Summit as to those claims.

### B. Retaliatory Discharge Claim

#### 1. *Plaintiff's* Prima Facie *Case of Retaliation*

Gonzalez' claim for retaliation is brought under both Title VII and the THRA. Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a). The "stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws." *Campbell v. Fla. Steel Corp.,* 919 S.W.2d 26, 31 (Tenn. 1996). Thus, the analysis of a retaliation claim under the THRA is the same as under Title VII. *See also* Tenn. Code Ann. § 4-21-101(a) ("It is the purpose and intent of the general assembly by this chapter to . . . [p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Act of 1964, 1968, and 1972. . . ."); *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Accordingly, the analysis of Gonzalez' Title VII Claim applies to the THRA claim as well.

Gonzalez has no direct evidence of a retaliatory motive on the part of Summit. Under Title VII and the THRA, a plaintiff seeking to establish a claim of retaliation with indirect evidence must first prove a *prima face* case of retaliation. "The plaintiff must make out a prima facie case of retaliation by establishing four elements: (1) the plaintiff engaged in an activity protect by Title VII; (2) the defendant knew that the plaintiff exercised his or her rights; (3) the defendant took an employment action against the plaintiff that a reasonable employee would have found materially adverse; and (4) there was a causal connection between the protected activity and the adverse employment action." *Watson v. City of*

7

*Cleveland*, 202 Fed. Appx. 844, 855 (6th Cir. 2006) (citing *Burlington N. & Santa Fe Rwy. Co. v. White*, 126 S. Ct. 2405, 2415 (2006)). The burden upon the plaintiff to establish a *prima facie* case of retaliation is minimal and easily met. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).

Proof of a Title VII retaliation claim is controlled by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). Under the *McDonnell-Douglas* burden-shifting framework, if the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802; *Wrenn*, 808 F.2d at 500. The plaintiff has the ultimate burden of persuasion even though a *prima facie* case, once established, shifts the burden of producing evidence to the defense. *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253; *Wrenn*, 808 F.2d at 500. Once the defendant produces evidence that it had a legitimate, nondiscriminatory reason for its allegedly retaliatory action, the burden shifts back to the plaintiff to show the reasons were pretextual. *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 508 (1993)). "Determining whether the reasons proffered by an employer are pretextual requires a heightened examination of the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *Carter*, 349 F.3d at 274 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 516 (1993)). To survive summary judgment, the plaintiff must at a minimum demonstrate the existence of material issues of disputed fact which, if resolved in the plaintiff's favor, would establish pretext by a preponderance of the evidence.

To establish pretext, the plaintiff must show that the defendant's proffered reason for its action: (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *Carter*, 349 F.3d at 274 (citing *Seay v. Tenn. Valley Auth.*, 339 F.3d 454 (6th Cir. 2003)). An employer's proffered nondiscriminatory basis for its adverse employment action cannot be pretext for disability discrimination if it is honestly held. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–08 (6th Cir. 1998). However, to establish that the proffered nondiscriminatory reason for its employment action was honestly held, "the employer must establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 807. "[T]he employee has the opportunity to produce 'proof to the contrary.' " *Id.*

8

Summit does not dispute that Gonzalez has established the first three elements of his *prima facie* case: He engaged in protected activity when he filed an EEOC complaint on January 12, 2006; the complaint was known to the Summit; and Summit obviously took an adverse employment action against Gonzalez when it terminated his employment on April 24, 2006. Thus, the question presented here is whether there is evidence of a causal connection between Gonzalez' filing his first EEOC complaint in January 2006 and his termination. "[T]o establish the element of causal link a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Avery Dennison*, 104 F.3d at 861 (citations and internal quotation marks omitted).

"Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). The plaintiff in the case at bar has not produced any evidence that he was treated differently from similarly situated employees, nor has he pointed to any other evidence of a causal link between his EEOC report and his termination, other than the fact that he was fired bared two months after filing a discrimination charge with the EEOC. The Sixth Circuit, however, "has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (holding that a time period of less than one month between the employee's protected activity and the adverse employment action in that case was sufficient to give rise to an inference of a causal connection between them); *see also Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) (finding that temporal proximity of less than two months was "sufficient to establish a link between [plaintiff's] pregnancy and her termination for the purposes of a prima facie case" in the context of a pregnancy discrimination claim); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that temporal proximity of less than three months was sufficient to give rise to the inference of a retaliatory motive). Because the adverse employment action in this case was taken just over two months after Gonzalez filed his first complaint with the EEOC, the Court finds that he has

9

presented sufficient evidence to give rise to an inference of a causal connection, thereby meeting the fourth and final element of his *prima facie* case.

### *2. Summit's Legitimate Non-Discriminatory Reason for Gonzalez' Discharge*

Summit has come forward with a legitimate, non-discriminatory reason for Gonzalez' termination. Specifically, Summit asserts that numerous employees, particularly nurses, had complained about Gonzalez' behavior and he had been counseled to improve his communications skills numerous times over the course of his employment. After the incident involving the telephone calls with Paula Beecher at All About Staffing, Tom Ozburn decided that the behavior complained about by Beecher, in light of the numerous prior complaints about Gonzalez' attitude toward his co-workers, "demonstrated a repeated pattern of conflict and poor judgment and ample opportunity for Mr. Gonzalez to improve his behavior." (Doc. No. 24, at 17.) Summit also points out that Ozburn had no reason to disbelieve Beecher or the other complaints regarding Gonzalez' behavior.

Gonzalez can meet his burden of showing pretext by producing evidence that Summit's proffered reasons for his discharge were false. Gonzalez contends that Summit's reasons for his discharge were false in that he disputes Beecher's version of the telephone conversations that occurred shortly before his termination, and, while acknowledging that Summit received complaints about his behavior, he contends that those complaints were false in that his statements were misunderstood or taken out of context. Regardless, even if Gonzalez' contentions about his behavior are true, he has not demonstrated that Summit had any reason to believe that the complaints about him were false or unwarranted. He has not pointed to any evidence suggesting that Summit's reason for terminating him had no basis in fact, did not actually motivate the adverse action, or was insufficient to motivate his firing. *Carter*, 349 F.3d at 274. Moreover, his disagreement with Summit's business judgment about the disruptive effect of his behavior on other employees does not create sufficient evidence of pretext in the face of the substantial evidence that Summit had a reasonable basis to be dissatisfied with Gonzalez' attitude and behavior toward other employees.

The Sixth Circuit has repeated reaffirmed its adoption of an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir. 1998). Under this rule, as long as an employer has an honest belief in its proffered

10

nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. *Id.* at 806. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied "on the particularized facts that were before it at the time the decision was made." *Id.* at 807.

The evidence in this case supports Summit's claim that it honestly believed in its proffered nondiscriminatory reason for discharging Gonzalez. Summit documented Gonzalez' problems with interpersonal communication beginning shortly after his hire and counseled him repeatedly that he needed to improve his skills in that area. Gonzalez' assertion that he did not speak inappropriately to Beecher or to the various Summit employees who complained about him, is insufficient to call into question Tom Ozburn's belief that he did. Consequently, the Court concludes that Gonzalez has not met his burden of raising a genuine issue of material fact as to whether Summit's reasons for discharging him were pretextual.

## IV. CONCLUSION

Lacking evidence to support his allegations, Plaintiff Antonio Gonzalez has elected to abandon all claims set forth in his complaint except his claim for retaliatory discharge. Summit is therefore entitled to summary judgment as to those claims. Further, although Gonzalez has produced sufficient evidence to support a *prime facie* case of retaliatory discharge, he has failed to rebut Summit's proffered legitimate, nondiscriminatory basis for his discharge. Accordingly, Summit is entitled to summary judgment in its favor as to that claim as well, and Gonzalez' complaint will be dismissed in its entirety.

An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge

11